**STATE of Tennessee, on relation of the Commissioner, Department of Transportation, for and on behalf of said Department, Petitioner–Appellant,**

v.

**Carl BRANDON, and wife, Frances Brandon, and Thomas G. Hull and wife, Joan Brandon Hull, Defendants–Appellees.**

Court of Appeals of Tennessee,
Eastern Section.

Dec. 30, 1994.

Application for Permission to Appeal
Denied by Supreme Court
May 8, 1995.

Charles W. Burson, Atty. Gen. and Reporter, for the State of Tenn., Cynthia L. Paduch, Asst. Atty. Gen., Nashville, for appellant.

J. Ronnie Greer, Greeneville, for appellees.

## OPINION

SUSANO, Judge.

This is a condemnation case. The State of Tennessee, on relation of the Commissioner

of the Department of Transportation (State), appeals the Judgment of the trial court awarding the Appellees (Landowners) $85,000 as compensation for the taking of their property and incidental damage to their adjacent property that was not taken. The State appeals the trial court's exclusion of evidence that the soil of, and water on and under, the condemned property were contaminated with various petroleum constituent substances. It requests an offset for its remediation costs against the jury award or a new trial. Because we believe that evidence of such contamination and the cost of remedying it were relevant in determining the fair market value of the property in question, we reverse and remand this cause for a new trial on all issues.

The State poses one basic issue: did the trial court err in prohibiting the introduction of evidence of contamination on the property in question, along with the cost of any necessary environmental remediation? The Landowners also pose an issue: did the State file its Notice of Appeal in a timely fashion?

The State filed a Petition for Condemnation of 0.554 acre of the Landowners' property as part of its improvement to the intersection of State Routes 35 and 70 in Greeneville. The State did not take the Landowners' adjoining .078 acres. An Order of Possession was duly entered. The property in question had been utilized for at least 40 years as a bulk oil distributorship and retail service station until approximately five years before being condemned. In December, 1991, after the entry of the Order of Possession, the State and its contractor removed three aboveground and one underground storage tanks on the property, and also conducted environmental testing of the soil and water on and under the property. Several soil samples and one water sample revealed contamination with petroleum constituents such as benzine and hydrocarbons in concentrations exceeding the safe drinking water levels established by the Tennessee Department of Environment and Conservation (Department). The State excavated the contaminated soil and conducted various remediation measures between January, 1992, and April, 1992.

The Department formally notified the Landowners of the soil and water contamination by letter in June, 1992, and instructed the Landowners to conduct an additional pollution survey and abatement procedures. One of the Landowners responded by letter denying the Department's allegation that contaminants had been released onto the property. When the Landowners again failed to acquiesce to a renewed demand that they abate the pollution on the site, the State undertook additional remedial measures. The State expended a total of $64,525.58 on remediation at the site according to the affidavit of its environmental remediation contractor.

The trial court, acting on the Motion of the Landowners, ordered the State and its attorneys and expert witnesses not to mention at trial the existence of contamination on the property, nor to reveal the cost of remediation. At trial, the State's two expert land appraisers were compelled to testify on the value of the property as if it were uncontaminated. The State's experts testified, respectively, that the property, in a "clean" state, was worth $65,100 and $72,500, while the Landowners' expert testified that the property was worth $135,000. One of the Landowners testified that the property was worth $150,000. The jury returned a verdict for the Landowners for $85,000, consisting of $75,700 for the 0.554 acre acquired and $9,300 for incidental damage to the small remaining parcel. After the jury retired, the State attempted to make an offer of proof concerning the contamination on the property and the cost of remediation, and the trial court agreed that such an offer could be made at a later date. The State subsequently deposed one of its land appraisal experts, who stated that his appraised "clean value" of $72,500 would fall to a fair market value of $7,974.42 once remediation costs were considered.

The State filed a Motion for Remittitur or Offset of Remediation Costs Against the Verdict on August 27, 1993, and supplemented that Motion in September by requesting a new trial on the sole issue of the effect of the soil and water contamination on the $85,000 jury verdict. The trial court denied the

State's motions by an Order entered on November 23, 1993. The State filed its Notice of Appeal on December 17, 1993.

■ The Tennessee Constitution provides that "no man's property [shall be] taken, or applied to public use, without the consent of his representatives, or without just compensation being made therefor." Tenn.Const. art. 1, sec. 21. Eminent domain statutes, enacted pursuant to this constitutional provision, must provide for just compensation. *Brooksbank v. Roane County,* 207 Tenn. 524, 341 S.W.2d 570 (1960). Likewise, "[a] court's objective in an eminent domain proceeding is to award just compensation for the taking to the landowner." *State ex. rel. Com'r v. Williams,* 828 S.W.2d 397, 400 (Tenn.App. 1991).

■ "Just compensation" is defined as "the fair cash market value of the property or property rights taken and adding to the same the amount of incidental damage done to the residue of the owner's property, if any, ..." T.C.A. § 29–17–810. The courts have defined a property's "fair cash market value" as "the price which would be paid by a willing buyer from [sic] a willing seller at the time the land was taken *considering all of its potential uses,*" *Williams* at 400 (Emphasis added) (citing *Shelby Co. v. Mid–South Title Co., Inc.,* 615 S.W.2d 677 (Tenn.App.1980)). A similar if older judicial definition describes just compensation as "the fair cash value of the land taken for public use, estimated as if the owner were willing to sell, and the [purchaser] desired to buy, that particular quantity [of land] at that place and *in that form.*" *Alloway v. City of Nashville,* 88 Tenn. 510, 13 S.W. 123 (1890) (Emphasis added). Both of these definitions make it clear that a property's market value depends upon its "form."

At the time of the taking in the instant case, the Landowners' property was in a desirable location: at the intersection of two state highways. The potentially lucrative uses of the property, however, were subject to a severe limitation: the polluted "form" or condition of the land. *Id.*

The trial court's Order provides no rationale for its exclusion of the State's evidence of this contamination. The Tennessee Rules of Evidence define "relevant evidence" as evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn.R.Evid. 401. Relevant evidence is generally admissible, Tenn. R.Evid. 402, unless a statute or rule provides otherwise or unless "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R.Evid. 403. In the case at bar, there can be no doubt that the contaminated nature of the property would be evidence relevant to the issue of valuation. Tennessee judicial precedent establishes that a property's "form" is relevant. *Alloway,* 13 S.W. at 123. Moreover, the State produced the affidavit of a banker, who stated that

> [t]hese findings [regarding contamination] have an effect upon the fair market value of the property and factor into whether or not the bank would make a loan on the property.... In the past, I have required the property owner to cleanup the problem on his property as a condition of approving and closing the loan. Property used as an oil distributor bulk plant and gas station is a type of property that I would definitely insist upon an environmental assessment as a condition on whether or not the bank would make a loan on the property. *I have never closed a loan on a property knowing there is an existing environmental contamination problem.* (Emphasis added)

The State also submitted the affidavit of a property appraisal expert, who asserted that

> [w]hen appraising property that might have an environmental problem, banks routinely require an environmental assessment due to the real and/or potential costs they may be liable for in order to remediate these environmental problems. To determine the fair market value of a property when a potential environmental problem exists, I appraise the property as though it is clean, and then offset from that amount any attendant costs for the investigation and remediation of said environmental

problems. Also to be considered is the stigma attached to such properties ... [which] often results in a detrimental effect upon the fair market value of the property rendering it worthless or even a liability to the owner.

If a property's contaminated condition hinders a prospective buyer's ability to obtain a loan to purchase it, then surely that condition is relevant on the issue of valuation. It is clear that soil and water contamination would tend to make a lower market value "more probable ... than it would be without the evidence." Tenn.R.Evid. 401. We therefore hold that the trial court should have permitted the introduction of evidence of contamination in this eminent domain case. The error of the trial court's Order excluding such evidence is underscored by the surreal spectacle of the State's land appraisal experts being forced to testify before the jury as if the land were uncontaminated, when they in fact knew that surveys had found soil and water on and under the property to be contaminated.

By the same token, we also find and hold that evidence of the cost of reasonable steps taken to remedy the contamination is also relevant to the issue of the fair market value of the property taken. Therefore, the trial court was in error in excluding testimony on this subject. Upon the retrial of this case, the court should permit the introduction of evidence bearing upon the reasonable procedures necessary to remedy the problem and the cost of same.

At least three other state appellate courts have reached a conclusion similar to our own. In *Redevelopment Agency of the City of Pomona v. Thrifty Oil Co.*, a California intermediate appellate court reviewed a jury award in an eminent domain proceeding. 4 Cal.App.4th 469, 5 Cal.Rptr.2d 687 (2 Dist. 1992). The property in question had been used as a gas station. The opinion notes that "[t]he soil on the land was contaminated due to gasoline spillage." *Id.* 5 Cal.Rptr.2d at 688. While the relevancy of the contamination does not appear to have been challenged in that case, the landowner did question whether the remediation issue was properly

before the jury. The court rejected that challenge, noting that

... we cannot agree with Thrifty's suggestion that [Pomona] engaged in "wasteful cleanup." Nor are we persuaded by the contention that the remediation issue was not properly before the jury. The contamination of the property was used by all experts in determining the fair market value of the property. Extensive cross-examination was conducted as to the proper remediation procedure and the costs of different types of remediation. Inherent in this discussion was the reasonableness of the procedures taken by [Pomona]. **As a characteristic of the property which would affect its value, the remediation issue was properly before the trier of fact.**

*Id.* at 689, n. 9 (Emphasis added).

In *City of Olathe v. Stott*, 253 Kan. 687, 861 P.2d 1287 (1993), the Supreme Court of Kansas stated the following as a part of the "syllabus by the court:"

Underground petroleum contamination necessarily affects the fair market value of real property. Evidence of such contamination is admissible in an eminent domain proceeding.

*Id.* 861 P.2d at 1288.

Also pertinent to our analysis is the case of *State of Florida, Dept. of Transportation v. Finkelstein*, 629 So.2d 932 (Fla.App. 4 Dist. 1993). That case involved an eminent domain proceeding arising out of the construction of Interstate I–595. It was conceded by the parties that the property to be taken was contaminated with petroleum hydrocarbons. Florida argued that evidence of the contamination and the cost of clean-up were relevant to the valuation process. Tenneco Oil Company, as lessee of the property, argued that the proof offered was irrelevant to the issue of value. In reversing the lower court's exclusion of the proffered evidence, the appellate court pointed out that

[i]f the property involved possesses some characteristic affecting its value on the date of taking, how can it be said that such a characteristic is irrelevant as Tenneco claimed and the court ruled below? On the contrary, the trier of fact should con-

sider any factor which impacts upon the market value of the property and is a proper basis for the expert's consideration....

\* \* \* \* \* \*

Having established that the contamination and cost of rectifying that condition was relevant evidence to be considered by the jury, we would point out that the mere cost of remediation is not the sole effect of contamination. In our judgment, the mere fact that the property is, or has been contaminated, may have a direct bearing upon the value of the property in the marketplace. Apropos of that consideration, we look to the case of *Florida Power & Light Co. v. Jennings,* 518 So.2d 895, (Fla.1987), wherein the Supreme Court of Florida reviewed a condemnation judgment in favor of the property owner which involved the admissibility of evidence of the public's fear of high voltage electric transmission lines as they affect the market value of the remaining property. The court held:

> In conclusion, we hold that any factor, including public fear, which impacts on the market value of land taken for a public purpose may be considered to explain the basis for an expert's evaluation opinion. Whether this fear is objectively reasonable is irrelevant to the issue of full compensation in an eminent domain proceeding.

*Id.* at 899.

*Jennings* teaches that characteristics of the condemned property are the things of which a real estate expert's opinion is made. They are the factors which influence a purchaser in determining how much to pay for a piece of property. Some of those characteristics are fear generated by high voltage electric transmission lines, contamination of property by gasoline hydrocarbon, and toxic waste of all kinds.

Thus, the evidence which DOT attempted to offer relative to the contamination of the property and the cost of remediation was relevant to the value of the property on the date of taking, but it was also relevant regarding the effect which the stigma of contamination would have on its market value in the mind of the buying public. DOT's experts were prepared to offer evidence that the opinion of an interested buyer would be affected by the fact that the property had suffered contamination, as well as its present condition. *Id.* at 933–34.

■ In addition to finding that the trial court committed error in excluding evidence of the soil and water contamination and the remediation costs associated with this pollution, we also hold that this error involves "a substantial right" that "more probably than not affected the judgment" below. Tenn. R.App.P. 36(b); however, we reject the State's suggestion that we should simply reduce the amount of the award by the cost of the remediation efforts taken by the State. We believe that a new jury should be empaneled to hear such relevant evidence as may be offered by both sides on the issue of fair market value, including the nature and extent of the contamination, the reasonable measures required to correct the problem, the reasonable cost of those measures, and the effect of all of this on the property's fair market value.

The Landowners urge that the State failed to file its Notice of Appeal in a timely fashion. The Tennessee Rules of Appellate Procedure provide that when a party timely files a motion under Rule 59.04 to alter or amend the judgment, then "the time for appeal for all parties shall run from the entry of the order denying a new trial or granting or denying any other such motion." Tenn. R.App.P. 4(b). Within 30 days of the entry of the trial court's Judgment, the State filed a Motion for Remittitur or Offset of Remediation Costs Against the Verdict. The trial court denied that Motion by an Order entered November 23, 1993. Therefore, the State's Notice of Appeal, filed on December 17, 1993, was timely. This issue is without merit.

For the foregoing reasons, the Judgment of the trial court is reversed and this cause is remanded for a new trial. The costs of this appeal are taxed to the Appellees.

FRANKS, J., and BYERS, Senior Judge, concur.